## Ex Parte J. W. Johnson.

### No. 877.   Decided October 12, 1910.

**Murder—Habeas Corpus—Bail—Disease—Melancholia.**

Where the relator (who was charged with a capital offense) under art. 175, White's Code Criminal Procedure, made application for bail on the ground that he was afflicted with a disease rendering his removal necessary for the preservation of his life, and that any species of confinement would endanger his life, and the evidence showed that he was suffering with melancholia and anaemia, and that his ailment would not necessarily endanger his life, an order of the court removing the relator to different quarters for proper treatment and comfort will not be reversed, and was authorized under said Article of the statute.

Appeal from the Criminal District Court of Dallas.   Tried below before the Honorable Robert B. Seay.

Appeal from an order denying bail and removing relator to other quarters, the defendant being charged with a capital offense.

The opinion states the case.

*M. M. Brooks,* for relator.

*John A. Mobley,* Assistant Attorney-General, for the State.

McCord, Judge.—Under the provisions of Article 175, White's Code of Criminal Procedure, relator sued out a writ of habeas corpus before the Judge of the Criminal District Court of Dallas County, Texas, and in his petition he alleged that he was in legal custody and confined in the county jail of Dallas County under an indictment for murder and that "he is afflicted with a disease which renders his removal necessary for the preservation of his life and that any species of confinement will endanger his life."   The writ was granted and on September 29th the Criminal District Court of Dallas County, upon a hearing, refused the application and remanded the relator to the custody of the sheriff of Dallas County, and in addition thereto made the following order:   "Because, however, of the condition of the relator and because the court finds that a more suitable place should be found for the relator than the county jail, owing to the fact that said jail is undergoing repairs, it is further ordered by the court that the sheriff of Dallas County at once procure a room for the defendant, not in the jail, and that the relator be allowed such food as the jail physician may order, and that the wife of the relator be allowed to visit the said relator at such times as may be directed by said physician to be best for the comfort and improvement of the relator."   From this order relator has appealed to this court and insists that under the evidence he is entitled to bail, because further confinement would endanger his life.   Article 175, White's Penal Code reads as follows:   "When a judge or a court authorized to grant writs of habeas corpus shall be satisfied, upon investigation, that a person in legal

custody is afflicted with a disease which will render a removal neces-
sary for the preservation of life, an order may be made for the re-
moval of the prisoner to some other place where his health will not
be likely to suffer, or he may be admitted to bail when it appears that
any species of confinement will endanger his life." It will be seen
from the reading of this article, that if upon an investigation under a
writ of habeas corpus it is shown that the party in legal custody is
afflicted with a disease which will render his removal necessary for the
preservation of life an order may be made for the removal of the
prisoner to some other place where his health will not be likely to
suffer, or he may be admitted to bail when it appears that any species
of confinement will endanger his life. This is the second application
of relator for a writ of habeas corpus. Upon the first hearing on the
facts of the case the district judge had refused relator bail and from
that order he appealed to this court and this court affirmed the judg-
ment of the lower court denying bail on June 23, 1910. In the present
application bail was sought on the ground of the relator being afflicted
with a disease that would render his confinement dangerous to his life.
On the trial of the case relator placed on the stand Dr. T. A.
Sumners, who testified that he had seen the relator twice. The first
time on September 25th and again on September 29th, the day he tes-
tified. Continuing this witness testified as follows: "Defendant is suf-
fering somewhat under a melancholy condition, and becoming more
anæmic; I did not take his temperature, but his respiration was sub-
normal, so was his pulse. An anæmic condition means where one begins
to emaciate and lose flesh. It means loss of vitality. It is probably true
that men frequently lose flesh without becoming anæmic. In regard
to the physical condition of the defendant, I would say that while I
never knew him before, and only saw him a time or two before this
occurrence came up, but never had any personal dealings with him,
if you take a man that had had out-door exercise and an active life
and then pen him up, he is going to emaciate, and is going to lose
his flesh, and there is where the trouble comes in. I don't know,
but I believe if you take a man like I am, rosy and healthy, and coop
me up, I don't believe I could stay down there two weeks. I would
hardly say there is any condition there different from any other
jail, nevertheless if you take a man who has had active exercise and
pen him up he is going to lose his nervous vitality. From my examina-
tion of the defendant and the surroundings there I believe that fur-
ther imprisonment of the defendant there will endanger his life; I
believe he is likely to lose his life by remaining there longer in jail,
but I would not say how long he might stay there, you understand
that; I could not say how long it would take to kill him; it is my
professional opinion that it would endanger his life to stay there
longer. I don't know anything in the world about what he has been
eating, or whether he has been eating anything at all. As to the
condition of his bowels, I only know what he told me and what the

other inmates told me. As far as palpitation of the liver is concerned and over his transverse colon, it is normal, and the spleen is nearly normal, also over the liver, but there wasn't any gas there. Those conditions are brought about by abnormal circulation, ptomaines, and infection brings it about. If he has not had any food in his stomach for ten or fifteen days, and has not eaten anything that would produce that condition, and if his bowels had not acted for four or five or six or ten days that would increase that condition. Calomel given to a man in that condition would not do him any good." On cross-examination he testified: "I would not say how long that man will live, if he is kept confined in jail. If you take any healthy man and confine him in jail for a long period of time, as to whether or not it will endanger his life is owing to the condition in which he went there. As to whether or not confinement of the defendant in that jail for a month longer would endanger his life, I don't believe that man will live a month longer in that jail; I am not guessing at that, not particularly so; I have stated what disease afflicts him; the disease is nothing more than the confinement and the melancholia condition he is going into; he is a regular, typical neurasthenic, that is what he is going to be; the term neurasthenia means when you begin to lose your blood, and the leuocyte begins to take up the red blood corpuscles. Anyone who has been an active man will lose flesh by confinement. If you take a man with good lungs and put him in a close room, with carbonic acid gas about him, and he might live longer than some other man might, and a man might go in there with a crippled lung and die right now. It is not my idea, by any means, that anybody who was put down there in that jail would not live very long, but it is owing to the condition that the man is in when he is carried there; I don't know the condition of the defendant when he was carried there; the defendant is in a melancholic condition and is becoming a regular neurasthenic; that includes loss of blood and loss of air, or the oxygen that a man ought to have for his lungs; I said this, that those conditions of confinement would bring on anæmic conditions and emaciation, and from close confinement the man will become anæmic." Dr. Gantt testified as follows: "I saw the defendant at noon last Saturday; I was not there in conjunction with Dr. Sumners; I was by myself; I took the defendant's respiration at that time, which was 16 or 17; his temperature was subnormal; it was 97, and normal is 98 3-5; his pulse was 63 and it may be 65 when it is normal; 72 is a normal pulse, but his normal pulse may be 65 or 68 or may be 80, I don't know about that. As to what was the matter with the man at that time, my opinion is that he is worrying over his troubles, and he is not eating anything, or at least I don't think he is, but he is not assimilating what he does eat, and when a man worries he may eat all he wants to and his digestion is not going to be good, and if he does not assimilate what he eats he had just as well not eat at all. Q. How, then, from the symptoms that he then had and

the symptoms manifested by the testimony of Dr. Sumners, do you think the further confinement of that man would likely endanger his life there in that place? A. Well, not seeing the man but once, I would not make any statement to that effect. From what Dr. Sumners says you would think that it would endanger his life, but then that is not my opinion altogether. The man is worrying more than anything else, and he is more than likely not eating anything; one of the attendants told me that he said his bowels had not moved in two weeks, but I don't know that to be a fact. He showed no symptoms of his bowels not having moved; his mind was clear and he had no gas on the bowels, and his respiration was good, and his tongue was fairly clean and he showed no symptoms of auto-infection or absorption from the intestinal canal. If the defendant will lie down on his back and not take any exercise it will injure him, but I think he gets plenty of fresh air; now, I don't know that he gets the proper food, and so far as medicine is concerned, I don't think the man needs any medicine; he needs good wholesome food and needs some rest; he can't get that in that cell he is in. Q. Well, if he is confined in that cell you think it would endanger his life to be kept there? A. Well, if he is kept there a certain time, and the man is not going to eat, and not allowed any exercise, or not allowed to take any exercise, he is not going to digest what he eats, and he is not going to eat as long as he worries. In his present condition I think he is able to take exercise; I think he could walk now, or on last Saturday when I saw him. He is in a cell on the second floor of the jail. If his bowels have not moved for seventeen days and he has not eaten anything since last Saturday it would not keep him from walking to-day, without he had absorbed a great many toxins from the intestinal canal and it brought up a high fever and distended his abdomen, and then perhaps he would not be able to walk, but a man has got to be confined to his bed for sometime before he is not able to walk. Q. If Dr. Sumners has accurately described this man's condition to-day, do you believe, in the light of what you saw last Saturday, that the imprisonment of that man there will endanger his life? Now, I understand you have not seen him to-day, but concede what Dr. Sumners saw about him to-day to be correct, do you believe that the further imprisonment of that man there will likely endanger his life, in that cell? A. Well, if he continues to brood over his trouble and refuses to eat, and his bowels had not moved, it certainly would endanger his life, but if he eats, and lays aside a certain amount of brooding and gets the proper movement for his bowels, there is no reason why it should endanger his health; I would not think the jail was a very good health resort, because I would not want to sleep there one night. As to the condition of the jail, perhaps under the circumstances they are doing the best they can; the jail is crowded; I don't know how many men they put in the cell with the defendant; I only saw two bunks, and he was on the upper one; there is only one alleyway leading to the cell he is in,

and I don't think there is any run-around, except outside of the cell, and I don't know that he has been allowed access to that. A man might have the privilege of walking around and still he might be brooding over his troubles so that he would not take advantage of his exercise; in other words, if the man did not eat the nutrition would become less and less in the body. This man seemed to be suffering from melancholia; that will produce an anæmic condition, on account of lack of nutrition to the body, because he does not eat enough, and what he does eat perhaps he does not assimilate, that is, take it up and put it into the tissues for the body. It is likely that that melancholia would not be diminished by defendant's further incarceration; I would not say positively that it would not; I would say that if he remained under the same conditions of mind that he is in the melancholia could not be any worse than it is, but he would have a falling away or loss of weight on account of non-assimilation, and would have less resisting power.

Q. Now, that being true, doesn't it occur to you that the further incarceration of him would not only increase his melancholia on the ground that he had less mental grasp to resist it, and would it also increase or decrease his powers of nutrition, that is of assimilating his food, and therefore wouldn't those two things be calculated from a medical standpoint, to endanger his life, by imprisoning him further in that place? A. Well, if you would put him in another room and let him have as much freash air as he has down there—there is plenty of air goes through the jail—and give him good companions and give him something that is appetizing, and take his mind off of his trouble, he would be, perhaps, in as good condition there as he would walking around on the streets. Confinement will produce melancholia, especially when a charge is hanging over a man; now if you take a man that has no conscience, and nothing highly bred about him, he won't brood over it; if a man was unjustly imprisoned it would increase his melancholy more than anybody else. I should judge the defendant to weigh 135 or 138 pounds. That is not the average weight for him, from a life insurance standpoint; he is about five feet and nine or ten or eleven inches, and his weight would be about 160 or 165 pounds. On cross-examination he testified:

"I could not say whether he has lost any flesh down there or not; he said he had lost some weight; I could not tell whether he had lost any or not, from seeing him the first time; I would not attribute the fact that the defendant had melancholia to the fact that his case is shortly set for trial; I would consider that the man had the beginning of melancholia as soon as he was put in there; melancholia don't develop in a week, but you have the beginning of melancholia; the true term melancholia is not a disease, but is only a symptom; melancholia is brooding over anything, but it is not a disease of the mind; it is not a disease of the body, but it can produce disease. If this man were out of confinement it would relieve his condition to a certain

extent; the fact that he would feel free to a certain extent would cause him not to worry as much because he would have companions to associate with, but he would worry just the same, but it would not affect him to the same extent; his general appearance was good when I examined him, and I should think that his bowels had moved in less time than two weeks; if defendant was worrying he would not digest his food as well as if he was not worrying; a man can eat like a hog and lie down and get fat if he is not worrying; in this man I found no symptoms of any wasting disease, and no acute process at all; the man's life endangered to this extent, that more than likely he is not assimilating what he does eat, and undoubtedly he is worried about his condition; he is worrying about himself as well as his troubles; I think his condition is caused by mental worry more than by the confinement; I don't know what the man's tendencies are when he is out, whether he is of an active or a lazy disposition." These were the only witnesses upon the stand either by the relator or the State. After the hearing of this testimony the court below ordered the relator to be removed from the jail and placed in a room in the courthouse and supplied with nourishing food, medicine and his wife allowed to visit him and surrounded him with all the comforts necessary. We are of opinion that the testimony does not make out a case under the statutes and we deduce from the testimony offered, in this case, that relator is suffering more or less from melancholia and that this is produced by his confinement, together with the charge hanging over him. We know, as a matter of fact, that it would produce a state of mind and condition that would bring about a weakened and lowered physical condition in anyone who has led an active life to imprison him on a grave charge and accusation, removed from his associates, and having constantly before his mind his surroundings and environments; and that a man would not be as healthy and robust as if he were free to go and come when and where he pleased. The condition of relator in this case, from the testimony, is but the condition of three-fourths of the parties confined in jail. We are, therefore, of opinion that relator has not shown such a case as brings him under the provisions of Article 175 of the Code of Criminal Procedure which authorizes bail if he is so diseased as that further confinement will necessarily endanger his life.

Finding no error in the order of the court below, the judgment is affirmed.

*Affirmed.*